UNITED STATES of America, Plaintiff,

and

Yonkers Branch–National Association For the Advancement of Colored People, et al., Plaintiffs–Intervenors,

v.

YONKERS BOARD OF EDUCATION; City of Yonkers; and Yonkers Community Development Agency, Defendants.

CITY OF YONKERS and Yonkers Community Development Agency, Third–Party Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, and Secretary of Housing and Urban Development, Third–Party Defendants.

No. 80 Civ 6761 (LBS).

United States District Court, S.D. New York.

Nov. 20, 1987.

U.S. Dept. of Justice, Housing and Civ. Enforcement Section, Civil Rights Div., Washington, D.C., Brian Heffernan, Manuel Vargas, for plaintiff U.S. of America.

Michael H. Sussman, Yonkers, N.Y., for plaintiff-intervenor N.A.A.C.P.

Vedder, Price, Kaufman, Kammholz & Day, New York City, Michael W. Sculnick, for defendants City of Yonkers and Yonkers Community Development Agency.

Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., John B. Weaver, John H. Dudley, Mark Nelson, for defendant Yonkers Bd. of Educ.

U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., Raymond LaRizza, and John W. Herold, Office of Litigation, U.S. Dept. of Housing & Urban Development, Washington, D.C., for third-party defendant Dept. of Housing & Urban Development.

## OPINION

SAND, District Judge.

The parties are before me in connection with a dispute which has arisen concerning access by the Outside Housing Advisor ("OHA"), Oscar Newman, to the files of the Yonkers Planning Board and his ability to communicate directly with the Yonkers City Planning Commissioner, Philip Pistone, without the presence or intervention of the Yonkers Corporation Counsel. *See* Newman Letter of November 14, 1987, Court Ex. I of November 19, 1987. Before turning to the specifics of that dispute, it may be helpful to all concerned to review the status of efforts to identify suitable building sites for the construction of public housing and implementation of this Court's Housing Remedy Order of May 28, 1986. It is also appropriate for the Court to explain the reasons for its Order of November 9, 1987, continuing and imposing a further freeze on the Austin Avenue Executive Office Development and for the Court to state its intent to impose further such Orders with respect to comparable projects in Yonkers. This background should provide a useful context in which one may evaluate matters of timing and procedure with respect to the OHA's inquiries.

The progress to date in identifying available sites has been extremely disheartening and the attitude of the representatives of Yonkers has been to do nothing affirmative, to place the entire onus of implementation on the Court, and to engage in obstructive and dilatory tactics. To date, there have been untoward delays in implementing the Housing Remedy Order some 18 months after its promulgation. Only the threat of bankrupting fines has produced any action by the City. But the technique of threatened fines alone appears not to be adequate. While such a procedure may be effective in obtaining performance of a single act, it is less effective in facilitating an ongoing course of conduct which requires a good faith desire to achieve the intended result. A court of equity may face enforcement difficulties in requiring an ongoing course of conduct, but it may effectively prohibit the taking of other relevant action which impedes the desired result until the desired result is achieved. A new approach is necessary to motivate Yonkers to comply with the Constitution and the orders of a federal court.

Despite the begrudging progress with respect to public housing, one need only pick up the real estate section of any local newspaper to conclude that Yonkers is in many respects a highly desirable market for real estate development. Office parks and luxury housing projects are announced and appear to be progressing. The entrepreneurship, creativity and government assistance and encouragement for these projects appears to be readily forthcoming, in sharp contrast to what occurs when it comes to Yonkers' discharge of its 1980 commitment to HUD to build 200 units of public housing in East Yonkers and to implementing the orders of the federal court.

More is involved than merely contrasting attitudes. As the Court has often noted in the past, one of the techniques which other communities are utilizing to create housing opportunities is to link the granting of zoning changes, variances, tax subsidies and other forms of governmental assistance to a builder's willingness to furnish to the

city, in exchange for the opportunity to develop these lucrative projects, land and buildings at lower or no cost to meet the city's housing needs.

Recognizing this relationship between private development and construction of housing, the Court instructed the Outside Housing Advisor to advise the Court of any and all projects anywhere in Yonkers which contemplate or require some City action: in other words, all projects in which the builder cannot build as of right but requires some City action such as a zoning change, variance, tax abatement, industrial bonds, etc.

By letter dated November 14, 1987 (Court Ex. II, 11/19/87), the OHA has advised of four such projects. These are:

(1) the Austin Avenue Executive Office Development, a 100 acre development, which, I am advised will receive the benefits of:

(i) City and County land assemblage;

(ii) a land lease schedule which reflects the future profitability of the development;

(iii) financing from a bond issue by either the City or County;

(iv) sales-tax exemption from construction costs; City and County tax abatements;

(v) and a five year reduction in utility costs;

(2) Wilmorite Mall, which I am advised will require a zoning change once its Environmental Impact Statement is approved by the City;

(3) Southwest Westchester Executive Park, which I am advised will receive the following additional benefits from the City:

(i) A real estate tax abatement for the first 10 years; a 50% abatement the first year, diminishing by 5% each year for the next 10 years,

(ii) City financing, raised through a City bond issue,

(iii) Tax exemption from all sales tax normally applied to the cost of construction,

(iv) A 10 to 15% reduction in the cost of utilities for the first 5 years of occupancy.

(4) Pierpoint on the Hudson. This is a planned 2,000 unit luxury apartment development, with adjoining commercial space, being constructed on 17 acres of city-owned Community Development Agency land in southwest Yonkers. I am advised that there are still some city-owned parcels which must be conveyed to this project. This project will require a zoning change after its Environmental Impact Statement is approved.

The Court hereby imposes or, where subject to a prior court order, continues a freeze on any City action in furtherance or implementation of all of these projects and will impose a like freeze on any other subsequently identified similar projects. Thus, the Court will freeze City action on projects contemplated not only on land which is itself suitable for public housing in East Yonkers, but also on projects elsewhere in the city which can be utilized as stated above, for furtherance of housing in East Yonkers.

If the Court concludes, after close examination of each such project, that it bears no possible utility for furthering the housing remedy goals, the freeze will be lifted. If the Court concludes otherwise, the freeze will continue in effect until the City has designated sites for 200 units of public housing, which sites are controlled by it and available for construction of housing.

A site will be deemed "available" if it is owned by the City either by virtue of prior ownership, release by the School Board (whether voluntarily or through court order), relinquishment by the County of reverter rights, purchase, exchange, or other form of acquisition. If Yonkers has not yet actually acquired the site but can furnish to the Court meaningful representations that such acquisition is entirely assured, the Court will entertain an application to lift the freeze. Site designations must not call for a population density which will defeat the purposes of the Housing Remedy Order by simply creating a minority enclave. The concept of scattered site housing, as envisioned in the so-called "alternative plan" is clearly in everyone's best interests.

The Court fully recognizes the consequences of this procedure on the real estate market and overall economy of Yonkers. The Court need not be told that this ruling casts a shadow of doubt, delay and expense on virtually every major real estate development project in Yonkers. The Court's response to those who may innocently suffer by virtue of this determination is that both the responsibility for the existing condition and the ability to effect its resolution lies with the City of Yonkers. Those concerned about property values, tax levels, bond ratings, interest costs, employment opportunities and all other matters relating to the existence of a sound, attractive environment for residents, business and industry should make their views known, not to the Court, but to their representatives. The first priority of Yonkers must be to comply with the Orders of the federal court. All other real estate development must take a secondary role until such compliance exists.

It is in the power of the City of Yonkers to demonstrate that it is acting diligently and in good faith to obtain the requisite sites, for example, by prevailing on the County—a body highly responsive to local needs and wishes—to release the reverter to County land identified by the OHA; by negotiating for the acquisition of the Yonkers Raceway property suitable for exchange with the City of New York to obtain the Hillside Reservoir site, and by other similar means, including purchase.

With respect to the acquisition of privately-owned land, some further comments are in order. First, vacant privately-owned land suitable for public housing exists in Yonkers. For example, there is a privately-owned vacant tract near School 30 which would appear to be ideal for housing. Second, the cost to Yonkers for acquisition of privately-owned land is a matter of relative values. For example, the Court believes that a modest estimate of the costs of this litigation exceeds $15,000,000. If Yonkers succeeds in blocking construction of 200 units of public housing in East Yonkers, it must return to HUD the $19,760,000 in Community Development Block Grants it received from 1980 to 1984 and forego the additional $10,184,000 it is slated to receive for 1985–1987. Yonkers may be well advised to commit some of the resources it expends in efforts to frustrate the Court's Order to efforts to implement it.

The sites Yonkers designates may, of course, be those the OHA has recommended or other sites available to the City, including sites which may now be privately-owned. If a new site is designated, it will be acceptable if it meets the HUD criteria and the purposes and policies embodied in the Housing Remedy Order.

In determining which sites may be used, the City may include the School 4, Whitman, Lincoln and School 30 sites. For reasons which will be addressed later, the Court has concluded that these sites may be utilized as City property for housing purposes. The City may also determine *not* to use one of these sites (for example the School 30 site, which entails only 18 units of housing and requires loss of some woodland area), provided a suitable alternative site is designated, and there is no delay. Thus, the Court is, in effect, placing renewed responsibility on Yonkers, which heretofore has entirely abdicated discharging such responsibility. Hopefully the representatives of Yonkers will now have a greater incentive to act affirmatively and diligently, since the representatives of Yonkers control, in large part, the duration of the freeze which the Court has imposed and will, if appropriate, expand.

The OHA is, of course, to continue his efforts. The OHA and Yonkers are to be engaged in separate but parallel activities. If a suitable site is located and its availability obtained, it will be of little moment to the Court or the citizens of Yonkers whether the site was first identified by Mr. Pistone or Mr. Newman. The important priority is to make progress in implementing the Housing Remedy Order and restoring the real estate market in Yonkers to a healthy and productive condition.

SO ORDERED.